IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 4:08-cr-00070 |
| v. : | |
| : | (Chief Judge Kane) |
| SHAWN COOYA and RITZ WILLIAMS, : | |
|    Defendants : | |

**MEMORANDUM**

On July 29, 2009, a grand jury returned a superceding indictment charging Defendants Shawn Cooya and Ritz Williams with first-degree murder. (Doc. No. 155.) The Government filed a notice of intent to seek the death penalty against each Defendant on July 30, 2009. (Doc. Nos. 161, 162.) Presently pending before the Court is Defendant Cooya's supplemental motion to sever his trial and any potential penalty phase proceedings from that of his co-Defendant Williams in the above-captioned action. (Doc. No. 450.) The motion has been fully briefed and is ripe for disposition. For the reasons stated more fully herein, the Court will deny Defendant Cooya's motion.

**I.     BACKGROUND**[1]

Defendants Cooya and Williams and the victim Alvin Allery were at all times relevant to this motion prisoners at the Allenwood Federal Correctional Complex ("AFCC"). (Doc. No. 450 ¶ 1.) On September 28, 2005, Defendants Cooya and Williams were captured on videotape walking in an internal corridor at the AFCC with Allery. (Id. ¶¶ 1, 3-6.) The videotape shows Defendant Cooya grabbing Allery from behind and pinning his arms behind his back while

---

[1] The facts material to the motion, and included in this background section, do not appear to be in dispute. To that end, and because the Government has not included a statement of facts in its brief in opposition, the Court will cite Defendant's motion for all factual statements.

1

Defendant Williams swings his right arm repeatedly towards Allery's upper torso, stabbing him. (Id. ¶ 8.) Next, the videotape shows Allery falling to the floor, and Defendants Cooya and Williams repeatedly kicking him until prison authorities intervene. (Id. ¶¶ 8-9.) An autopsy revealed that Allery had been stabbed ten times. (Id. ¶ 10.) The cause of Allery's death was listed as sharp force and blunt force injuries. (Id.) On September 21, 2006, approximately one year after this incident, Defendant Cooya told Special Agent Timothy O'Malley of the Federal Bureau of Investigation that the murder was not planned, that Allery and Defendant Williams had been arguing as they walked along the corridor, and that Defendant Cooya did not know that Defendant Williams had a weapon when Defendant Cooya grabbed Allery. (Id. ¶ 24.)

On June 20, 2011, Defendant Cooya filed a motion to sever his trial and any potential penalty phase proceedings from that of Defendant Williams pursuant to Rule 14 of the Federal Rules of Criminal Procedure. (Doc. No. 380.) On September 7, 2011, the Court denied the motion without prejudice, granting Defendant Cooya leave to attempt to further develop his contention that a joint trial and penalty phase would prevent Defendant Williams from providing exculpatory testimony on Defendant Cooya's behalf. (Doc. No. 426 at 12-13.) Defendant Cooya filed the instant supplemental motion to sever on November 14, 2011. (Doc. No. 450.) The Government filed a brief in opposition on December 6, 2011 (Doc. No. 462), and Defendant Cooya filed a reply brief on December 30, 2011 (Doc. No. 474).

## II.     DISCUSSION

Defendant Cooya moves for severance of the proceedings in the above-captioned action pursuant to Rule 14 of the Federal Rules of Criminal Procedure. (Doc. No. 450.) In support of his motion, Defendant Cooya argues that a joint trial and penalty phase will prevent Defendant

Williams from providing exculpatory testimony on Defendant Cooya's behalf. (Doc. No. 451 at 4.) In resolving this motion, the Court will first review the standard for joinder and severance of criminal trials and then consider Defendant Cooya's argument in support of his motion.

Rule 8(b) of the Federal Rules of Criminal Procedure permits defendants to be charged together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). In the present matter, the appropriateness of joinder pursuant to Rule 8(b) is not in dispute. Rule 14 of the Federal Rules of Criminal Procedure, in turn, permits a district court to sever the defendants' trials in those cases where joinder would prejudice a defendant. Fed. R. Crim. P. 14(a). Recognizing the "vital role" joint trials play in the criminal justice system, however, the United States Supreme Court has stated a "preference" for joint trials of defendants who are indicted together. See Zafiro v. United States, 506 U.S. 534, 537 (1993) ("[Joint trials] promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts") (citation and internal quotation marks omitted); United States v. Urban, 404 F.3d 754, 775 (3d Cir. 2005). As explained by the United States Court of Appeals for the Seventh Circuit:

> Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses, who need not return to court for additional trials; they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague, even though one or the other (or both) undoubtedly committed a crime. The joint trial gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome.

United States v. Buljubasic, 808 F.2d 1260, 1263 (7th Cir. 1987); see also Buchanan v. Kentucky, 483 U.S. 402, 418 (1987) (noting that in joint trials juries are better able to arrive at a reliable conclusion regarding guilt or innocence and fairly assign blame during sentencing).

Given the policy favoring joint trials, a motion to sever trials is not to be freely granted. See United States v. Quintero, 38 F.3d 1317, 1343 (3d Cir. 1994) (recognizing that a defendant has "a heavy burden in gaining severance"). "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540. Rather, where a matter has been properly joined, a court may only grant a motion to sever where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. The Court, however, acknowledges that in capital cases the heightened need for reliability requires that the Court be vigilant in protecting the constitutional rights of each defendant. Lockett v. Ohio, 438 U.S. 586, 604 (1978).

The sole argument asserted by Defendant Cooya in this motion is that a joint trial will prejudice him by preventing Defendant Williams from testifying on his behalf. According to Defendant Cooya, Defendant Williams will testify that the murder of Allery was not planned and that Defendant Cooya did not know that Defendant Williams possessed a weapon at the time of the murder. (Doc. No. 450 ¶ 26.) It is well established that "bare assertions that co-defendants will testify are insufficient" to justifying severing trials. United States v. Davis, 397 F.3d 173, 182-83 (3d Cir. 2005) (quoting United States v. Boscia, 573 F.2d 827, 832 (3d Cir. 1978)). The United States Court of Appeals for the Third Circuit has articulated four factors a district court must evaluate in determining whether the potentially exculpatory testimony of a co-defendant warrants separate trials: "(1) the likelihood of the co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; [and] (4) judicial economy." Boscia, 573 F.2d at 832 (holding that

severance was not justified even where counsel "represented orally to the court that he had spoken with co-defendants who had indicated a willingness to testify in [the defendant's] behalf if there were separate trials").[2] The Court will address each of these factors in turn.

### A.    Likelihood of Defendant Williams Testifying

In order to satisfy the first Boscia factor, Defendant Cooya must demonstrate that Defendant Williams would in fact testify at Defendant Cooya's trial.  Several courts have held that the requisite likelihood of a co-defendant testifying is not established where he conditions his testimony in a severed trial on his own trial being held first.  See United States v. Spinelli, 352 F.3d 48, 56 (2d Cir. 2003) ("[S]uch conditional offers 'smack of bad faith.'"); United States v. Bates, 46 F. App'x 104, 109 n.3 (3d Cir. 2002) ("[This] prong . . . is not satisfied where a co-defendant places conditions on his willingness to testify.") (quoting United States v. Reavis, 48 F.3d 763, 767 (4th Cir. 1995)); United States v. Blanco, 844 F.2d 344, 353 (6th Cir. 1988) ("We are not willing to read Rule 14 as a mechanism for . . . [co-defendants] to control the order in which they are tried.").

Defendant Cooya argues that Defendant Williams's offer to testify is not premised on Defendant Williams being tried first.  In support, he has produced an affidavit from Defendant Williams's counsel stating that "[Defendant] Williams will testify at trial for [Defendant] Cooya, but will not testify at his own trial or in a joint trial, no matter the order in which the trials proceed."  (Doc. No. 450-1 at 1 (emphasis added).)  In opposition, the Government sets forth four arguments: (1) the failure to procure an affidavit from Defendant Williams himself casts

---

[2] The Court notes that "the Third Circuit has never granted severance pursuant to the Boscia factors in a reported opinion." United States v. Done, No. 09-601, 2011 WL 3912756, at *5 (D.N.J. Sept. 6, 2011).

doubt on the likelihood of Defendant Williams testifying on Defendant Cooya's behalf; (2) Defendant Williams's willingness to testify is "an attempt to manipulate the Court" because Defendant Williams made his willingness to testify known only after Defendant Cooya filed a motion to sever; (3) the affidavit's lack of specificity and failure to explain Defendant Williams's motive for testifying indicate that it is unlikely that Defendant Williams will actually testify; and (4) Defendant Williams will most likely choose to not testify after he understands the consequences of doing so.  The Court will address each of these arguments in turn.

First, the Government questions the likelihood of Defendant Williams testifying on Defendant Cooya's behalf because Defendant Cooya has not produced an affidavit from Defendant Williams himself, asserting that Defendant Williams "has not bound himself by oath to a statement of his proffered testimony." (Doc. No. 462 at 4.)  The affidavit of Defendant Williams's counsel, however, affirmatively states that Defendant Williams will testify on Defendant Cooya's behalf if the trials are severed. (Doc. No. 450-1 at 1.)  Although the Court cannot conclude that it is beyond question that Defendant Williams will testify on Defendant Cooya's behalf should the Court grant the instant motion to sever, Defendant Cooya is not put to such stringent proof.  See United States v. Parodi, 703 F.2d 768, 779 (4th Cir. 1983) (a movant's showing that a co-defendant's testimony at a severed trial is sufficient if the likelihood is reasonably probable, not absolutely certain); United States v. Shufford, 454 F.2d 772, 778 (4th Cir. 1971) (finding that the defendant should not be precluded from offering a co-defendant's testimony "simply because that probability was not an absolute certainty").  The Court cannot conclude that Defendant Cooya's failure to produce an affidavit from Defendant Williams, and Defendant Cooya's reliance on an affidavit from Defendant Williams's counsel, requires a

finding that there is no reasonable probability that Defendant Williams will testify.

Second, with respect to the timing of Defendant Williams's decision to testify on Defendant Cooya's behalf, the Government cites no legal authority to support its contention that Defendant Williams's willingness to testify on Defendant Cooya's behalf is an attempt to manipulate the Court solely because he did not make his willingness known before Defendant Cooya filed a motion to sever. The Government also suggests that Defendant Williams decided to testify only after Defendant Cooya filed his first motion to sever and after he had an opportunity to review the Government's discovery materials, thereby "learn[ing] of [Defendant] Cooya's self-serving statement to the same effect." (Doc. No. 462 at 4.) In response, Defendant Cooya asserts that the affidavit of Defendant Williams's counsel indicates that Defendant Williams "has always maintained with his attorneys a desire to exculpate Cooya and testify in a separate trial." (Doc. No. 474 at 4.) The Court finds that neither the Government nor Defendant Cooya have sufficiently supported their contentions with evidence of record or legal authority. Therefore, the Court finds that these contentions do not weigh strongly for or against a finding that the first <u>Boscia</u> factor has been satisfied.

Next, the Government questions the likelihood of Defendant Williams testifying on Defendant Cooya's behalf because the affidavit of Defendant Williams's counsel neither explains Defendant Williams's motivations for testifying nor specifically details Defendant Williams's proposed testimony. The Government offers no legal authority to support the contention that Defendant Cooya must establish his co-defendant's motive for testifying on his behalf in order to satisfy this factor. The Court, however, notes that some indication of Defendant Williams's motive for testifying would strengthen a finding of his likelihood of

actually testifying on Defendant Cooya's behalf. In response to the Government's argument, Defendant Cooya contends that a motive to testify may be inferred from the facts that both Defendants Cooya and Williams are Native American, are from Arizona, and have "been transported by the Government far from their native state to be housed in a Federal Prison in rural Pennsylvania." (Doc. No. 474 at 5.) Defendant Cooya further indicates that Defendants Cooya and Williams, as Native Americans, are "united by a common experience, culture, and history." (Id. at 5-6.) In the absence of evidence of bad faith, the Court cannot find that the lack of evidence clearly establishing Defendant Williams's motive to testify on Defendant Cooya's behalf weighs against a finding that he is reasonably likely to testify. Regarding the affidavit's specificity, or lack thereof, the Court will address this contention with respect to the second Boscia factor – the degree to which Defendant Williams's testimony would be exculpatory.

Finally, the Court will address the Government's contention that Defendant Williams misapprehends the consequences of testifying on Defendant Cooya's behalf at a severed trial. The Government contends that should the Court grant the instant motion to sever it would request that Defendant Cooya be tried first and "would then use against [Defendant] Williams in his own trial statements he made during [D]efendant Cooya's trial" as admissions of a party opponent under Rule 801(d)(2)(A) of the Federal Rules of Evidence. (Doc. No. 462 at 6-7.) Further, the Government asserts that Defendant Williams "could not introduce anything he said [at Defendant Cooya's trial] that was favorable to him, including his testimony that the murder was not planned. When [D]efendant Williams fully understands [this] . . . it makes it that much less likely that he would actually testify in [D]efendant Cooya's trial." (Id. at 7.)

In response, Defendant Cooya argues that if the Court were to admit statements made by

Defendant Williams that are favorable to the Government at Defendant Williams's trial, Defendant Williams could then argue that any other statements he made are admissible to provide "context or to ensure fairness under a rule analogous to the rule of completeness" under Rule 106 of the Federal Rules of Evidence. (Doc. No. 474 at 7.) Defendant Cooya's argument is not persuasive. Any non-self-inculpatory statements made by Defendant Williams at Defendant Cooya's trial would be inadmissible even if they were made contemporaneously with other self-inculpatory statements. See Williamson v. United States, 512 U.S. 594, 599 (1994). The self-inculpatory statements, when offered by the Government, would be admissions by a party-opponent and, therefore, not hearsay under Rule 801(d)(2), but the non-self-inculpatory statements would be inadmissible hearsay. See id. at 599 (finding that "the fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts [which are hearsay]"). Moreover, Rule 106 applies only to written and recorded statements. See United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (finding that "[R]ule 106 'does not compel admission of otherwise inadmissible hearsay evidence'") (quoting Phoenix Assocs. III v. Stone, 60 F.3d 95, 103 (2d Cir. 1995)).

      The Court finds that the Government's argument regarding the consequences of Defendant Williams testifying at a severed trial held before his own trial has merit. Defendant Williams has made clear that he does not wish to testify at his own trial. (See Doc. No. 450-1.) The effect of Defendant Williams testifying at Defendant Cooya's trial, however, is that, at his own trial, he would be subjected to all the negative consequences of testifying on Defendant Cooya's behalf without any of the benefits. Thus, Defendant Williams may very well choose to not testify on Defendant Cooya's behalf at a severed trial upon learning of these consequences.

Defendant Williams, however, may also choose to testify on Defendant Cooya's behalf in spite of the above-discussed consequences.

In consideration of the foregoing arguments, the Court finds that first Boscia factor does not weigh strongly in favor of or against severance.

### B. Exculpatory Value of the Testimony and Impeachment

The Court will next address the second and third Boscia factors: the degree to which Defendant Williams's testimony would be exculpatory and the likelihood that Defendant Williams's testimony could be impeached. Regarding the second factor:

> A severance motion will not be granted unless the moving party demonstrates that her co-defendant's testimony would be more than a vague and conclusory statement . . . of purely cumulative or negligible weight or probative value. The movant's showing in this regard must be sufficiently definite so that the trial court can evaluate the exculpatory nature and effect of the co-defendant's potential testimony.

Reavis, 48 F.3d 763, 767 (internal citation and quotation marks omitted) (citing United States v. Parodi, 703 F.2d 768, 780 (4th Cir. 1983); see also Bates, 46 F. App'x at 109 n.3.

As discussed, Defendant Cooya asserts that Defendant Williams would testify that the murder of Allery was not planned and that he did not tell Defendant Cooya that he had a weapon on his person prior to the altercation with Allery. (Doc. No. 451 at 7.) If Defendant Williams so testifies, Defendant Cooya contends, the jury may find that Defendant Cooya did not substantially plan or prepare to kill Allery with premeditation and specific intent and, thus, the jury may find Defendant Cooya guilty of a lesser crime than first-degree murder, thereby eliminating the need for a penalty phase. (Id.) In the alternative, Defendant Cooya argues that if a penalty phase were still required, the jury may find that the Government failed to prove the

substantial planning aggravator based on Defendant Williams's testimony.  (Id.)

In opposition, the Government argues that, regardless of whether Defendant Williams told Defendant Cooya that he had a weapon on his person, videotape evidence shows Defendant Cooya initiating the attack by grabbing Allery and pinning his hands behind his back, continuing to hold Allery as Defendant Williams stabs him, and then kicking Allery in the head and torso approximately fifty-seven times after Allery fell to the ground. (Doc. No. 462 at 9-10.)  The Government emphasizes that in light of evidence demonstrating Defendant Cooya's "continued . . . assist[ance] in the murder after realizing [D]efendant Williams had a shank" followed by his full participation in repeatedly kicking Allery, any exculpatory value of Defendant Williams's testimony will be obviated.  (Id. at 11.)  Further, with respect to Defendant Cooya's alternative argument that the exculpatory nature of Defendant Cooya's testimony may arise during the penalty phase of the trial, the Government asserts that "Defendant Cooya has not cited any authority showing he is entitled to a severance when the only exculpatory value of the testimony is during the penalty phase of a capital trial.  The [G]overnment could find none."  (Id. at 12.)

Defendant Cooya, however, has crafted an argument justifying the reasons for his seemingly complicit participation in the killing of Allery.  According to Defendant Cooya, he was compelled to participate in the killing of Allery – once Defendant Williams began stabbing Allery – because "[w]hat is expected on the outside is not the norm behind bars.  Any showing of weakness or quarter will simply make the inmate the next target." (Doc. No. 451 at 8 (emphasis in original).)  Thus, "[h]is further participation in the assault on Allery . . . was dictated by prison code and what is need[ed] for survival."  (Id. at 10; see also Doc. No. 474 at 10.)

To support this argument, Defendant Cooya has produced an affidavit of Dr. Robert

Johnson, a Professor of Justice, Law, and Society at American University.  Dr. Johnson's scholarly work includes publications on "convict culture," a phrase he defines as "a distinct culture within prisons that is marked by violence as a way of life . . . . Convict culture features a violence-suffused way of life developed by a small but powerful minority of prisoners who have been, in effect, raised by the state in isolated institutional settings."  (Doc. No. 450-2 ¶¶ 3-5.)  In his affidavit, Dr. Johnson assesses Defendant Cooya's involvement in the killing of Allery in the context of this "convict culture," stating:

> The convict world is populated by men [who] feel they must constantly find occasions to show their honor and toughness or else be seen by others as weak and vulnerable to abuse.  In the convict world, there is no such thing as an accident, and hence there are no innocent bystanders in any encounter . . . .
>
> The convict world is a world of continuing – and generally escalating – conflict.  Aggrieved parties cannot afford to back down, for then they are seen as weak and hence vulnerable to more abuse . . . .
>
> In my opinion, rendered to a reasonable degree of professional certainty, Shawn Cooya's behavior – kicking of Inmate Allery and continued participation in the altercation after Williams' stabbed Allery – is consistent with convict culture and what would be expected by a prisoner in Cooya's position.

(Id. ¶¶ 8-10 (footnote omitted).)

According to the Government, Defendant Cooya's "convict culture" argument is an attempt to distract the Court from the facts that Defendant Cooya "expressed no surprise at seeing the shank and continued to not only hold [Allery] as he was stabbed 10 times, but then participated in kicking [Allery] in the head and body for minutes afterwards."  (Doc. No. 462 at 11.)  These acts, the Government contends, demonstrate Defendant Cooya's planning and premeditation with respect to the killing of Allery.  (Id. at 11-12.)

Upon consideration of these arguments, the Court finds that the videotape evidence of the killing of Allery significantly undermines Defendant Williams's proposed testimony that this murder was not planned and that he did not tell Defendant Cooya that he had a weapon on his person. Not only does the videotape show that Defendant Cooya expressed no surprise upon seeing Defendant Williams's weapon, but it also shows Defendant Cooya initiating the killing by grabbing Allery and pinning his hands behind his back before Defendant Williams begins stabbing him.

Moreover, the exculpatory effect of Defendant Williams's testimony is called into question by the lack of specificity of the affidavit of his counsel. As the Government points out, although Defendant Williams would purportedly testify that the "encounter" with Allery was not planned, the affidavit contains "no explanation of whether . . . [D]efendants never planned to run into [Allery] in the hallway, or planned on meeting [Allery] in the hallway, but did not plan the murder, or planned the attack but did not plan to use a shank." (Doc. No. 462 at 5.) In response, Defendant Cooya states that the affidavit "is sufficient to avoid surprise and to apprise the Government of what it needs to meet at trial." (Doc. No. 474 at 4.) Defendant Cooya, however, must do more than demonstrate that Defendant Williams's testimony will not cause surprise at trial. Rather, he must demonstrate that Defendant Williams's testimony would consist of more than vague and conclusory statements. See Reavis, 48 F.3d at 767.

Finally, any testimony by Defendant Williams, even if somewhat exculpatory, would be significantly undermined by impeachment evidence on cross-examination. It is well settled that if a co-defendant's proposed testimony lacks sufficient exculpatory content or would suffer from serious credibility problems at trial, severance is not required. See United States v. Powell, 982

F.2d 1422, 1433 (10th Cir. 1992) (affirming denial of a severance motion in part because co-defendant's proposed testimony stating that "neither he nor [defendant] had agreed to commit any crime" would have been impeached by virtue of overwhelming evidence of defendant's involvement in marijuana distribution).  Further, Defendant Williams's prior criminal record, which, according to the Government, includes prior assault, forgery, and murder convictions will almost certainly outweigh any exculpatory value that his proposed testimony could provide.  See, e.g., United States v. McConnell, 749 F.2d 1441, 1444 (10th Cir. 1984) (affirming denial of a severance motion in part because the Government would impeach declarant with an "extensive list of prior convictions").

Accordingly, the Court finds that the second and third Boscia factors weigh against severance.

### C.     Judicial Economy

Severance of Defendants' trials would result in two lengthy and nearly identical trials that would involve substantially similar evidence, such as witness testimony and videotape recordings.  As such, severance would require the Court to expend time and resources presiding over two separate multi-week trials involving substantially similar issues and evidence.  See, e.g., Richardson v. Marsh, 481 U.S. 200, 210 (noting the high costs of severing trials).  While these concerns do not outweigh legitimate allegations of prejudice, especially in capital cases, the Court concludes that the lack of undue prejudice, the similarity of the relevant evidence, and the toll that severance would have on the Court, the Government, law enforcement, witnesses, the victim's family, the potential jury pool, and the taxpayers requires a finding that the final Boscia factor weighs against severance.

**IV.    CONCLUSION**

Upon consideration of Defendant Cooya's supplemental motion to sever and the parties' briefs, the Court finds that severance is not warranted in this action. An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | **Criminal No. 4:08-cr-00070** |
| **v.** : | |
| : | **(Chief Judge Kane)** |
| **SHAWN COOYA and RITZ WILLIAMS,** : | |
| **Defendants** : | |

## ORDER

**NOW**, on this 24th day of April 2012, **IT IS HEREBY ORDERED THAT** Defendant Cooya's supplemental motion to sever (Doc. No. 450) is **DENIED**.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
